and of the Executive Committee of FMR; and Chairman and a Director of FMRC. Additionally, during the Class Period, defendant Abigail Johnson was an interested Trustee of at least 269 funds advised by FMR or an affiliate, and also acted as: a Senior Vice President of various Fidelity Funds, including the Fidelity Blue Chip Growth Fund; President and a Director of FMR; President and a Director of FMRC; and a Director of FMR Corp. Moreover, during the Class Period, defendant Lynch was an interested Trustee of at least 269 funds advised by FMR or an affiliate, and also acted as: Vice Chairman and a Director of FMR; and Vice Chairman and a Director of FMRC.

56. In exchange for creating and managing the Fidelity Funds, including the Fidelity Blue Chip Growth Fund, the Fidelity Large Cap Stock Fund and the Fidelity Small Cap Stock Fund, Fidelity charged the Fidelity Funds a variety of fees, each of which was calculated as a percentage of the funds' average net assets. Hence, the more money invested in the funds, the greater the fees paid to Fidelity. In theory, the fees charged to fund investors are negotiated at arm's-length between the fund board and the investment management company and must be approved by the independent members of the board. However, as a result of the Trustee Defendants' dependence on the investment management company, and their failure to properly manage the investment adviser, millions of dollars in Fidelity Funds assets were transferred through fees payable from Fidelity Funds assets to Fidelity that were of no benefit to fund investors.

57. As a result of these practices, the mutual funds business was enormously profitable for Fidelity. In this regard, a *Forbes* article, published on September 15, 2003, stated as follows:

---

paper entitled *Understanding the Role of Mutual Fund Directors*, available on the ICI's website at
(continued on next page)

> The average net profit margin at publicly held mutual fund firms was 18.8% last year, blowing away the 14.9% margin for the financial industry overall . . . . [f]or the most part, customers do not enjoy the benefits of the economies of scale created by having larger funds. **Indeed, once a fund reaches a certain critical mass, the directors know that there is no discernible benefit from having the fund become bigger by drawing in more investors; in fact, they know the opposite to be true - once a fund becomes too large it loses the ability to trade in and out of positions without hurting its investors.**
>
> \* \* \*
>
> **The [mutual fund] business grew 71-fold (20 fold in real terms) in the two decades through 1999, yet costs as a percentage of assets somehow managed to go up 29%. . . .** Fund vendors have a way of stacking their boards with rubber stamps. As famed investor Warren Buffett opines in Berkshire Hathaway's 2002 annual report: 'Tens of thousands of "independent" directors, over more than six decades, have failed miserably.' A genuinely independent board would occasionally fire an incompetent or overcharging fund advisor. That happens just about never."

[Emphasis added.]

58. On January 15, 2004, however, the SEC requested public comment on proposed amendments to rules promulgated under the Investment Company Act, which would significantly change fund governance practices. The amendments, which were adopted by the SEC on June 22, 2004 and will go into effect 18 months thereafter, require that independent directors comprise at least seventy-five percent of mutual fund boards and that the boards retain a chairman who is "independent" of the management company. In the latter respect, the relevant SEC Release stated the following:

> We propose to require that the chairman of the fund board be an independent director. The Investment Company Act and state law are silent on who will fill this important role on fund boards. Today, a director who is also an officer of the fund's investment adviser serves as chairman of most, but not all, fund boards. In

---

http://www.ici.org/issues/dir/bro_mf_directors.pdf.

many cases, he (or she) also is the chief executive officer of the adviser. This practice may contribute to the adviser's ability to dominate the actions of the board of directors.

The chairman of a fund board can largely control the board's agenda, which may include matters not welcomed by the adviser. The board is required to consider some matters annually in connection with the renewal of the advisory contract, but other matters the board considers at its discretion, such as termination of service providers, including the adviser. Perhaps more important, the chairman of the board can have a substantial influence on the fund boardroom's culture. The boardroom culture can foster (or suppress) the type of meaningful dialogue between fund management and independent directors that is critical for healthy fund governance. It can support (or diminish) the role of the independent directors in the continuous, active engagement of fund management necessary for them to fulfill their duties.

**A boardroom culture conducive to decisions favoring the long-term interest of fund shareholders may be more likely to prevail when the board chairman does not have the conflicts of interest inherent in his role as an executive of the fund adviser. Moreover, a fund board may be more effective when negotiating with the fund adviser over matters such as the advisory fee if it were not at the same time led by an executive of the adviser with whom it is negotiating. If such negotiation leads to lower advisory and other fees, shareholders would stand to benefit substantially.**

[Emphasis added.]

59. The amendments had the support of all living former SEC Chairmen, including Harvey Pitt and Arthur Levitt, who wrote in a June 15, 2004 letter to SEC Secretary Jonathan Katz, signed by David S. Ruder on behalf of all seven former Chairmen, that:

An independent mutual fund board chairman would provide necessary support and direction for independent fund directors in fulfilling their duties by setting the board's agenda, controlling the conduct of meetings, and enhancing meaningful dialogue with the adviser. **We believe an independent board chairman would be better able to create conditions favoring the long-term interests of fund shareholders than would a chairman who is an executive of the adviser.**

[Emphasis added.]

60.  In a February 17, 2004 *Wall Street Journal* editorial entitled "Interested, and Proud of It," Ned Johnson criticized the SEC's proposal. "Proud to disclose" his "vested interest" in the funds he manages, Johnson asserted that fund chairmen with ownership stakes in a fund's management company, most notably himself, should retain their dominance over fund policy because, among other reasons, "There will always be risk of malfeasance in any industry."

61.  Johnson criticized the SEC's proposal for encroaching upon "shareholder democracy," or investors' ability to influence fund governance policy by withdrawing assets from underperforming fund families. Johnson argued that such "shareholder democracy" had adequately protected mutual fund investors in the past. Dismissing the normative benefits securities legislation has on executives' wrongful conduct, Johnson further wrote, "It is the moral fiber and effectiveness of the men and women in charge and in the trenches – **not laws or a chairperson's so-called independence** – that provide shareholders with the greatest degree of protection." [Emphasis added.] Johnson continued,

> Regulators want to substitute a law in place of shareholders'
> judgment, by mandating that mutual fund chairpersons be
> "independent." If this rule is adopted, the immediate result will be
> to reduce the expertise and hands-on "feel" of mutual-fund board
> chairs across the industry, whose long experience equips them to
> detect subtle nuances in fund operations.

62.  Moreover, while conceding that "having an independent chairperson is [not] always a bad choice," and "fund chairpersons should be accountable and subject to serious independent oversight," Johnson stated that,

> Mandating an independent chairperson is akin to requiring that
> every ship have two captains. I don't know about you, but if a ship
> I was sailing on were headed for an iceberg, I'd want one – and
> only one – captain giving orders. I'd like to know that he'd spent
> some time at sea and knew what he was doing – and if he owned
> the ship, so much the better.

63.     For the three fiscal years ended March 31, 2003, Fidelity mutual fund investors paid management fees totaling $1.6 billion, despite a loss of 24% in 2001, a loss in value in 2002 and a loss in value of 25% in 2003. Over the last decade, investors in the Fidelity Magellan Fund have paid $4 billion in management fees yet the defendants' advice has led to a significant under-performance compared to the S&P 500 Index. In the words of Vanguard Group Inc. founder John C. Bogle, "When there are two clearly distinct corporate ships -- the management company and the fund, each with its own set of owners -- there ought to be two captains."

64.     Due in large part to the conflicted boardroom culture created by Fidelity's interested directors, specifically including its chairman Ned Johnson, plaintiff and other members of the Class never knew, nor could they have known, from reading the fund prospectuses or otherwise, of the extent to which Fidelity was using, *inter alia*, so-called 12b-1 fees, Soft Dollars (as defined below) and directed brokerage commissions to improperly siphon assets from the funds to assist in peddling its wares to unwitting investors.

### Fidelity Used Rule 12b-1 Marketing Fees For Improper Purposes

65.     Rule 12b-1, promulgated by the SEC under Section 12(b) of the Investment Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met. The Rule 12b-1 conditions, among others, are that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made." Additionally, the directors "have a duty to request and

evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether the plan should be implemented or continued." The directors may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. 80a-35(a) and (b)] of the Act that **there is a reasonable likelihood that the plan will benefit the company and its shareholders.**" [Emphasis added.]

66.     The Rule 12b-1 exceptions to the Section 12(b) prohibition on mutual fund marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things being equal, should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors. During the Class Period, the Trustee Defendants authorized, and Fidelity collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees.

67.     However, the purported Rule 12b-1 fees charged to Fidelity Funds investors were highly improper because the conditions of Rule 12b-1 were not met. There was no "reasonable likelihood" that the 12b-1 plans would benefit the company and its shareholders. On the contrary, as the funds were marketed and the number of fund investors increased, the economies of scale thereby created, if any, were not passed on to Fidelity Funds investors.

68.     Significant economies of scale exist when a fund's assets under management increase more quickly than the cost of advising and managing those assets. For example, the cost of providing investment advisory services, including portfolio selection services, to the Fidelity Funds might be $X for the first $100 million of assets under management but the cost of

providing those same services for the next $100 million is a mere fraction of $X. This is true in part because each Fund's investment objectives are set forth in their offering documents and additional dollars contributed by shareholders are simply invested in the same core portfolio of securities.

69. The assets under management in the Fidelity Funds have grown dramatically in the past decade, even accounting for the stock market declines experienced in recent years. For example:

(a) At the close of 1993, the Fidelity Contrafund had just over $6.2 billion in assets under management and defendants received almost $26 million in management fees. According to recent regulatory filings, by December 31, 2003, this fund's assets had jumped to nearly $36 billion and fees had soared to over $176 million per year. Therefore, assets under management increased more than five times during this period and management fees grew at a comparable or greater rate, demonstrating that any economies of scale created did not inure to the benefit of the Contrafund investors.

(b) In early 1994, the Fidelity Magellan Fund had over $33 billion in assets under management and defendants were paid approximately $186.5 million in management fees. From the March 2004 annual report, Fidelity Magellan Fund assets increased further to over $66 billion while fees increased to over $370 million in a single year for a single fund portfolio. Assets under management therefore doubled during this period and management fees grew at a comparable rate, demonstrating that any economies of scale created did not inure to the benefit of the Magellan Fund investors.

(c) In 1994, the Fidelity Growth & Income Fund had over $8.7 billion in assets under management, and defendants received approximately $41 million in total

management fees. According to recent regulatory filings, by July of 2003, this fund's assets had jumped to over $28 billion while fees paid to the defendants soared to nearly $130 million in a single year. Therefore, assets under management tripled during this period and management fees grew at a comparable rate, demonstrating that any economies of scale created did not inure to the benefit of the Fidelity Growth & Income Fund investors.

(d) For the year ending July 1994, the Fidelity Blue Chip Growth Fund Fund had over $2.2 billion in assets under management while defendants received approximately $8.5 million in management fees. According to recent regulatory filings, by July 2003, this fund's assets had jumped to almost $20 billion while fees soared to over $100 million per year, again for a single portfolio. Therefore, assets under management increased more than nine times during this period and management fees grew at a comparable or greater rate, demonstrating that any economies of scale created did not inure to the benefit of the Blue Chip Growth Fund investors.

(e) In 1994, the Fidelity Low-Priced Stock Fund had just over $2 billion in assets under management and defendants received almost $14 million in management fees. According to recent regulatory filings, by July 2003, this fund's assets had jumped to almost $20 billion while fees soared to almost $100 million for another single portfolio. Therefore, assets under management increased ten times during this period and management fees grew at a nearly comparable rate, demonstrating that any economies of scale created did not inure to the benefit of the Blue Chip Growth Fund investors.

70. As of late 1993 to early 1994, the management fees for the Fidelity Funds discussed immediately above totaled approximately $275 million. As of the most recent reporting period, annual management fees for such funds exceeded $876 million. This

represents roughly a three-fold increase in fees, an increase directly proportional to the increase in size of the funds under management. In other words, the defendants have retained all of the benefits resulting from economies of scale, benefits that are owned by, and should have been paid to, the Fidelity Funds and Fidelity Funds investors.

71.    Additionally, technological advances have increased the economies of scale and reduced the costs of providing investment advisory services to the vast number of shareholder accounts the defendants are charged with overseeing. As summarized in a rare, November 6, 1994 *Boston Globe* interview with Ned Johnson, Fidelity

> was, for a while, the heaviest single buyer of Wall Street Journal ads. [Johnson] also invested heavily in computers, which allowed investors instant access to their own accounts. These innovations and strategies set the pace for [what was then] a $2 trillion mutual fund industry. Combined with the talents of Peter Lynch and a cadre of fund managers who repeatedly put Fidelity at the top of the performance lists, the company benefited more than any other from the explosion of mutual fund investing in the 1980s.

72.    A July 23, 1995 *Boston Globe* article also noted Fidelity's historic reputation for investing heavily in technology to streamline fund operations. The article stated the following:

> Just as Fidelity's ads created waves, so its state-of-the-art computer systems set the industry standard. Stories abound of Johnson's fascination with computers, a passion as abiding as his father's interest in the stock market . . . For a two-year period in the mid-1980s, Johnson plowed more than $150 million into computers and backup systems each year.

73.    A January 8, 2004 article in the newsletter *Running Money* entitled "The Emerging 'One Fidelity' Juggernaut" stated the following regarding Fidelity's investments in technology:

> Fidelity spends massively on technology. [Ex-Fidelity tech executive Robert] Hegarty, now a vice president at research firm TowerGroup, says Fidelity spends $515 million a year on technology just for its asset management business – which is a jaw-dropping 10% of all IT spending in the asset management

industry. "And over the last four or five years, they've gotten much smarter about managing their IT budget," he says.

Thanks to better budgeting and lower tech costs, Fidelity's overall tech budget has come down from $2 billion a year to $1.8 billion. About two-thirds of the money is spent on its 7,000-strong technology staff, but the emphasis on technology starts with Johnson. "He gets more involved in technology than any other CEO on Wall Street," says Donald Haile, who oversees Fidelity's internal technology and communications infrastructure. How involved? Haile, a longtime IBM veteran before coming to Fidelity, meets with Johnson every other week and speaks with him weekly.

Technology allows Fidelity to handle 81% of its customer contact over the Web, up from 78% a year earlier. That's important because a customer session online costs just 5% of one over the phone. [...]

So Fidelity has built the most visited Web site of any mutual fund company. Fidelity.com draws more than twice as many monthly visitors as Vanguard.com, according to Nielsen/NetRatings. It even draws more Web page views than many online brokers, including Charles Schwab and E*Trade.

74. The benefits of such economies of scale belong to the Fidelity Funds and Fidelity Funds investors and should have been passed on to them through lower fees, including the use of breakpoints. The agreements between the defendants and the Fidelity Funds do not incorporate breakpoints although the defendants offer breakpoints to other institutional clients. There are higher costs inherent in running a smaller fund, and conversely, lower costs in running a larger fund. The Fidelity Funds are among the largest in the world and, accordingly, should be among the least expensive in the world to advise.

75. Rather, Fidelity Funds management and other fees steadily increased throughout the Class Period, including those for funds which grew to gargantuan proportions, such as the Magellan Fund (currently with over $65 billion in assets under management), the Contrafund (currently with over $39 billion in assets under management) and the Puritan Fund (currently

with over $22 billion in assets under management). This was a red flag that the Trustee Defendants knowingly or recklessly disregarded. In truth, the Fidelity Funds marketing efforts were creating diminished marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance. If the Trustee Defendants reviewed written reports of the amounts expended pursuant to the Fidelity Funds Rule 12b-1 plans, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 plans, on a quarterly basis as required — which seems highly unlikely under the circumstances set forth herein — the Trustee Defendants either knowingly or recklessly failed to terminate the plans and the payments made pursuant to the Rule 12b-1 plans, even though such payments not only harmed existing Fidelity Funds shareholders, but also were improperly used to induce brokers to breach their duties of loyalty to their prospective Fidelity Funds investors.

76. Many of the Fidelity Funds charging Rule 12b-1 fees charged investors the maximum fees permissible pursuant to the Fidelity Funds Rule 12b-1 plans. There was no reasonable likelihood that the Rule 12b-1 fees would benefit the funds or their shareholders because the fees charged to shareholders failed to reflect diminished marginal costs. Therefore, the Rule 12b-1 plans authorizing such fees should have been terminated.

77. As set forth below, in violation of Rule 12b-1 and Section 28(e) of the Securities Exchange Act, defendants made additional undisclosed payments to brokers in the form of excessive commissions that were not disclosed or authorized by the Fidelity Funds Rule 12b-1 plans.

### Fidelity Charged Its Overhead To Fidelity Investors, Despite Its Own In-House Expertise In Financial Investment Research, And Secretly Paid Excessive Commissions To Brokers To Steer Clients To Fidelity Funds

78. Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well. Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary duties "solely by reason of [their] having caused the account to pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined **in good faith** that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. §28(e) (emphasis added). In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined to include, "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities." The commission amounts charged by brokerages to investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

79. Since its inception, Fidelity has actively promoted itself as, and earned a reputation for being, a paragon of financial investment research firms. Fidelity touts the fact that it has poured hundreds of millions of dollars into its own proprietary research apparatus, thus, presumably obviating the need for reliance on outside research. Yet, contrary to Fidelity's reputation for cultivating its enormous in-house research staff, Fidelity went far beyond what is

permitted by the Section 28(e) safe harbor by paying third parties for "research services" that provided no reasonable benefits to Fidelity Funds investors.

80.   As stated on the Fidelity website, "When Edward C. Johnson 2d became president and director of the small, Boston-based Fidelity in 1943, he instituted an approach to money management that remains the hallmark of Fidelity's investment culture today. Mr. Johnson believed that making money for shareholders was best accomplished through intensive market research . . . " http://personal.fidelity.com/products/ funds/content/approach.html.

81.   Fidelity currently markets itself to investors as the employer of the "largest staff of portfolio managers, analysts, and traders in the mutual fund industry, more than 600 worldwide." *Id.* Each one, according to the company's website, "shares one common trait with Mr. Johnson: a deep and abiding passion for research." *Id.* "[Fidelity's] team of analysts," according to the site, "publishes nearly 25,000 research reports annually and follows more than 4,800 companies, arming [its] fund managers with every resource available to uncover new investment opportunities in the global marketplace." *Id.* On its international site, Fidelity stresses that "with over 450 fund managers and analysts, we believe our research resources are unrivalled within the industry. These investment professionals carry out in-depth analysis to uncover the best opportunities, following our proven bottom-up stockpicking approach." http://www.fidelity-international.com/about.

82.   On August 31, 1998, *Financial News* announced that "Fidelity Investments has the best global in-house equity research, according to a poll of polls." Together with Capital Group, the article stated, "the two firms form an elite of global in-house research and have an astonishing lead over third-placed JP Morgan Investment Management."

83. In February 2004, the *South China Morning Post* announced that Fidelity had won yet another award for its research, the paper's 2003 Fund Manager of the Year Award. Douglas Naismith, managing director of Fidelity Investments in Hong Kong, told the paper:

> We are a research-driven company and that is our investment philosophy, quite simply. You need a big in-house research team to attain the consistency. You need to know what companies you want to hold and what companies you do not want to hold -- you need to know both sides of the coin.

Mr. Naismith further stated that generating sound, thoroughly researched investment ideas is "crucial" to Fidelity's achievement of outstanding performance.

84. Inconsistent with its highly-touted reputation for in-house research, Fidelity exceeded the bounds of the Section 28(e) safe harbor by using Soft Dollars to pay overhead costs, thus charging Fidelity Funds investors for costs not covered by the Section 28(e) safe harbor and that, consistent with the investment advisers' fiduciary duties, properly should have been borne by Fidelity. Fidelity also paid excessive commissions to broker-dealers, which, insofar as they were given under the guise of Soft Dollars, were a sham and utterly unjustifiable in light of Fidelity's in-house research apparatus. The purpose of these payments and Fidelity's directing brokerage business to firms that favored Fidelity Funds was to induce the brokers to steer their clients to Fidelity Funds. Such payments and directed-brokerage payments were used to fund sales contests and other undisclosed financial incentives to push Fidelity Funds. These incentives created an undisclosed conflict of interest and caused brokers to steer clients to Fidelity Funds regardless of the funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty. By paying the excessive brokerage commissions, Fidelity also violated Section 12(b) of the Investment Company Act because such payments were not made pursuant to valid Rule 12b-1 plans.

85. In a June 28, 2004 article entitled "Fidelity Toughens Up Against Soft Dollars For Market Data --- Fidelity to Cease Paying Extra to Get Data From Brokers," *The Wall Street Journal* reported that Fidelity was discontinuing its Soft Dollar payments to brokers for certain services. The story stated the following:

> Starting July 1, the nation's largest mutual-fund company will stop paying extra sums in brokerage commissions to gain access to market data from Bloomberg LP and other information providers, Fidelity Investments executives said. Instead, Fidelity will buy such services directly, paying cash out of its own pocket.
>
> * * *
>
> Eric Roiter, general counsel of Fidelity's investment-management arm, said the decision to pay directly for market data is expected to cost Fidelity $40 million to $50 million this year. Mr. Roiter said the company is negotiating with brokers to return commission money formerly earmarked for market data back to the mutual funds, where it will lower investor expenses. "We are simply putting our money where our mouth is," Mr. Roiter said. "We hear the consternation about soft dollars."
>
> Boston-based Fidelity isn't changing the way it pays for investment research, the biggest chunk of its soft-dollar payments. Fidelity said its stock mutual funds last year paid $815 million in commissions, of which it estimates about $160 million went for soft-dollar research and market data. Overall, mutual-fund and other institutional investors shelled out $1.24 billion last year in soft-dollar payments, down from $1.52 billion in 2002, according to consultant Greenwich Associates.

This article evidences Fidelity's ongoing misconduct and purported response to the growing scrutiny over the propriety of Soft Dollars, and that eliminating them can directly lower investors' expenses.

86. According to the Statement of Additional Information, during the fiscal year ended October 31, 2002, the Fidelity Blue Chip Growth Fund alone paid $7,085,357 in commissions to firms for providing research services. The excessive commissions did not fund any services that benefited the Fidelity Funds shareholders, and these practices materially

harmed plaintiff and other members of the Class from whom the Soft Dollars and excessive commissions were taken.

87. Fidelity also structured the commissions for its own internal sales representatives to cause the representatives to push Fidelity Funds over non-Fidelity funds and to push certain favored Fidelity Funds or investments over other non-favored Fidelity investments. Fidelity failed to disclose to investors that its sales representatives' purportedly impartial advice was in fact largely determined by commissions and hitting sales targets. For example, the base salary of a typical Fidelity branch representative might begin at $28,500, but his or her total income could reach $125,000 to $130,000 after commissions, despite Fidelity's widespread practice of representing to clients that representatives' compensation was strictly salary-based. These misleading sales practices are a further breach of fiduciary duties that had the effect of charging Fidelity investors excessive commissions while steering them into Fidelity investments that did not properly fit their financial objectives.

88. Additionally, on information and belief, the Fidelity Funds, similar to other members of the industry, have a practice of charging lower management fees to institutional clients than to ordinary mutual fund investors through their mutual fund holdings. This discriminatory treatment cannot be justified by any additional services to the ordinary investor and is a further breach of fiduciary duties. In the words of Morningstar analyst Kunal Kapoor, "Fees for a firm's retail products should not be materially different from management fees for a firm's institutional offerings. Though we appreciate the added costs of servicing smaller accounts, those expenses needn't show up in the management fees." Kunal Kapoor, "The Standards That We Expect Funds to Meet," Morningstar.com, Dec. 8, 2003.

## THE NOVEMBER 17, 2003 ANNOUNCEMENT

89.   On November 17, 2003, these abusive and improper practices began to come to light when the SEC issued a press release (the "November 17 SEC Release") in which it announced a $50 million settlement of an enforcement action against Morgan Stanley Dean Witter relating to improper mutual fund sales practices. The Fidelity Funds were identified the next day as one of the mutual fund families that Morgan Stanley brokers were improperly paid to push. In this regard, the release announced:

> the institution and simultaneous settlement of an enforcement action against Morgan Stanley DW Inc. (Morgan Stanley) for failing to provide customers important information relating to their purchases of mutual fund shares. As part of the settlement, Morgan Stanley will pay $50 million in disgorgement and penalties, all of which will be placed in a Fair Fund for distribution to certain Morgan Stanley customers.
>
> **Stemming from the SEC's ongoing industry-wide investigation of mutual fund sales practices, this inquiry uncovered two distinct, firm-wide disclosure failures by Morgan Stanley. The first relates to Morgan Stanley's "Partners Program" and its predecessor, in which a select group of mutual fund complexes paid Morgan Stanley substantial fees for preferred marketing of their funds.** To incentivize its sales force to recommend the purchase of shares in these "preferred" funds, Morgan Stanley paid increased compensation to individual registered representatives and branch managers on sales of those funds' shares. The fund complexes paid these fees in cash or in the form of portfolio brokerage commissions.

[Emphasis added.]

90.   The November 17 SEC release further stated:

> The Commission's Order finds that this conduct violated Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934. Section 17(a)(2) prohibits the making of materially misleading statements or omissions in the offer and sale of securities. Rule 10b-10 requires broker dealers to disclose the source and amount of any remuneration received from third parties in connection with a securities transaction. The Order also finds that the conduct violated NASD Rule 2830(k), which

> prohibits NASD members from favoring the sale of mutual fund shares based on the receipt of brokerage commissions.
>
> Stephen M. Cutler, Director of the Commission's Division of Enforcement, said: "Unbeknownst to Morgan Stanley's customers, Morgan Stanley received monetary incentives -- in the form of 'shelf space' payments -- to sell particular mutual funds to its customers. When customers purchase mutual funds, they should understand the nature and extent of any conflicts of interest that may affect the transaction."
>
> Morgan Stanley has agreed to settle this matter, without admitting or denying the findings in the Commission's Order. As part of the settlement, Morgan Stanley will pay $25 million in disgorgement and prejudgment interest. In addition, Morgan Stanley will pay civil penalties totaling $25 million.
>
> * * *
>
> In addition, Morgan Stanley has undertaken to, among other things, (1) place on its website disclosures regarding the Partners Program; (2) provide customers with a disclosure document that will disclose, among other things, specific information concerning the Partners Program, and the differences in fees and expenses connected with the purchase of different mutual fund share classes.
>
> Finally, the Commission's Order censures Morgan Stanley and orders it to cease-and-desist from committing or causing any violations of Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934.
>
> * * *
>
> The NASD also announced today a settled action against Morgan Stanley for violations of NASD Rule 2830(k) arising from the Partners Program and its predecessor.

91.     On November 18, 2003, *The Washington Post* published an article entitled "Morgan Stanley Settles With SEC, NASD." The article states in relevant part:

> Investors who bought mutual funds from Morgan Stanley, the nation's second-largest securities firm, didn't know that the company was taking secret payments from some fund companies to promote their products, according to allegations that resulted in a $50 million settlement agreement yesterday with the Securities and Exchange Commission.

> In many cases, those same investors were actually footing the bill, indirectly, for the slanted recommendations, the SEC said. Some of the 16 fund companies whose products were pushed by Morgan brokers paid for the marketing help by letting Morgan handle some of their stock and bond trading. The millions of dollars in commissions earned by Morgan on that trading came out of mutual fund share owners' profits, according to the SEC.

\* \* \*

> **Morgan said yesterday that companies in its "Partners Program" included . . . Fidelity Investments.**

\* \* \*

> Yesterday's settlement "goes to show that the mutual fund managers as well as broker dealers have too often viewed mutual fund shareholders as sheep to be sheared," said Sen. Peter Fitzgerald (R-Ill.), who is investigating the industry. "Congress has to figure out the variety of ways people are being sheared so that we can stop it."

[Emphasis added.]

92.  On January 14, 2004, *The Wall Street Journal* published an article under the headline, "SEC Readies Cases On Mutual Funds' Deals With Brokers." Citing "a person familiar with the investigation," the article notes that the SEC is "close to filing its first charges against mutual fund companies related to arrangements that direct trading commissions to brokerage firms that favor those fund companies' products." The article stated in pertinent part as follows:

> **The SEC has been probing the business arrangements between fund companies and brokerage firms since last spring.** It held a news conference yesterday to announce **it has found widespread evidence that brokerage firms steered investors to certain mutual funds because of payments they received from fund companies or their investment advisers as part of sales agreements.**
>
> Officials said the agency has opened investigations into eight brokerage firms and a dozen mutual funds that engaged in a longstanding practice known as "revenue sharing." Agency

officials said they expect that number to grow as its probe expands. They declined to name either the funds or the brokerage firms.

The SEC said payments varied between 0.05% and 0.04% of sales and up to 0.25% of assets that remained invested in the fund.

\* \* \*

**People familiar with the investigation say regulators are looking into examples of conflict of interest when fund companies use shareholder money to cover costs of sales agreements instead of paying the sales costs themselves out of the firm's own pockets. The boards of funds, too, could be subject to scrutiny for allowing shareholders' commission dollars to be used for these sales agreements. In other cases, the SEC is probing whether funds violated policies that would require costs associated with marketing a fund to be included in a fund's so-called 12b-1 plan.**

[Emphasis added.]

## The Prospectuses Were Materially False And Misleading

93. Plaintiff and other members of the Class were entitled to, and did receive, one or more of the prospectuses (the "Prospectuses"), pursuant to which the Fidelity Funds shares were offered, each of which contained substantially the same materially false and misleading statements and omissions regarding 12b-1 fees, commissions and Soft Dollars.

94. The Prospectus dated December 30, 2002 for funds offered by Fidelity Investment Trust, which includes the Fidelity Blue Chip Growth Fund, is typical of Prospectuses available for other Fidelity Funds. It states as follows with respect to 12b-1 fees, revenue sharing and directed brokerage:

> **Each fund has adopted a Distribution and Service Plan pursuant to Rule 12b-1 under the Investment Company Act of 1940 that recognizes that FMR may use its management fee revenues, as well as its past profits or its resources from any other source, to pay FDC for expenses incurred in connection with providing services intended to result in the sale of fund shares and/or shareholder support services. FMR, directly or through FDC, may pay significant amounts to intermediaries,**