26 438
fu

RECEIVED

MAY 0 5 2004

KELLER ROHRBACK L.L.P.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RECEIVED

04 MAY -4 PM 3: 02

CLERK U.S. DISTRICT
MIDDLE DISTRICT OF COURT
TAMPA, FLORIDA

MARCUS DUMOND, HENRY BERDAT, )
STUART V. and ROSEMARY STURGESS, )
KATHLEEN BLAIR, WILLIAM and MARGIE )
BOOTH, KAREN PEACH, and RICHARD and )
EVELYN KELLER, )
                                    )
                        Plaintiffs, )
                                    )
        v.                          )
                                    )
MASSACHUSETTS FINANCIAL SERVICES )
COMPANY and MFS FUND               )
DISTRIBUTORS, INC.,                )
                                    )
                        Defendants. )
                                    )

Case No. : 8:04-CV-1007-T-26M55

(THIS COMPLAINT DOES NOT ALLEGE LATE
TRADING OR MARKET TIMING CLAIMS)

## COMPLAINT

Plaintiffs, Marcus Dumond, Henry Berdat, Stuart V. and Rosemary Sturgess, Kathleen

Blair, William and Margie Booth, Karen Peach, and Richard and Evelyn Keller, for the use and

benefit of the MFS Capital Opportunities Fund, MFS Emerging Growth Fund, MFS Government

Securities Fund, MFS Government Limited Maturity Fund, MFS Mid Cap Growth Fund, MFS

Research Fund, MFS Value Fund, MFS Municipal Income Fund, MFS Strategic Growth Fund,

MFS Total Return Fund, and Massachusetts Investors Growth Stock Fund, sue Defendants,

Massachusetts Financial Services Company and MFS Fund Distributors, Inc., and allege:

### I. JURISDICTION AND VENUE

1. This action is a derivative action brought by Plaintiffs on behalf of the MFS Capital

Opportunities Fund, MFS Emerging Growth Fund, MFS Government Securities Fund, MFS

Government Limited Maturity Fund, MFS Mid Cap Growth Fund, MFS Research Fund, MFS

Value Fund, MFS Municipal Income Fund, MFS Strategic Growth Fund, MFS Total Return

Fund, and Massachusetts Investors Growth Stock Fund (collectively, the "Funds") pursuant to § 36(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. § 80a-35(b).

2.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

3.    Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b)(2)-(3).  Defendants are inhabitants of or transact business in this district, a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred in this district, and Defendants may be found in this district.

4.    All conditions precedent have been performed or have occurred.

## II. BACKGROUND

5.    Plaintiffs are shareholders in various open-end registered investment companies, or mutual funds (collectively, the "Funds") created, sold, advised, and managed with other funds as part of the Massachusetts Financial Services fund family or complex by Defendants (the "Fund Complex").

6.    MFS manages over $138 billion in assets and is the fifth largest load mutual fund family in the mutual fund industry.  All actions taken by Defendants have been taken by Defendants' authorized agents or have been ratified.

7.    Defendants, as the underwriters, distributors, advisors, and control persons of the Funds, owe fiduciary and other duties to Plaintiffs and all shareholders of the funds in the Fund Complex.

8.    Defendants receive fees paid by Plaintiffs and other shareholders of the Funds for providing (a) pure investment advisory services and (b) administrative services.  These fees are based on a percentage of the net assets of each of the Funds.

9.    The pure investment advisory services Defendant Advisors provide to the Funds are identical to the investment advisory services Defendant or its affiliates provide to other clients, such as the Public Employee Retirement System of Idaho ("PERSI"), and entail essentially identical costs.

10.    Despite the equivalence of the investment advisory services Defendant Advisor provides to the Funds and its other clients, the fees in dollar amounts that Defendants receive from the Funds that are attributable to pure investment advisory services are much higher than the fees Defendants or their affiliates receive from other clients for the identical services. *See* ¶¶ 56 - 59, *infra*.

11.    Defendant Distributor also charges distribution fees for marketing, selling, and distributing mutual fund shares to new shareholders pursuant to distribution plans that Defendants have adopted with respect to the Funds pursuant to Rule 12b-l, 17 C.F.R. § 270.12b-1 ("Distribution Plans"). The distribution fees are based on a percentage of the net assets of each of the funds in the Fund Complex. Under the Distribution Plans, Defendants collect distribution and service fees in excess of $40 million annually from the Massachusetts Investors Trust, a large blend stock fund, alone. Defendants purportedly collect distribution fees in order to grow or stabilize the assets of the Funds so that the Funds can benefit from economies of scale through reduced advisory fees.

### Section 36(b) of the Investment Company Act of 1940

12.    In 1940, Congress enacted the Investment Company Act of 1940, 15 U.S.C. § 80a-l et seq. (the "ICA"). The ICA was designed to regulate and curb abuses in the mutual fund industry and to create standards of care applicable to investment advisors such as Defendants. In the 1960s, it became clear to Congress that investment advisors to equity mutual funds were

3

gouging those funds with excessive fees, particularly by not taking economies of scale into account. As a result, § 36(b), 15 U.S.C., § 80a-35(b), was added to the ICA in 1970, which created a federal cause of action for breach of fiduciary duty.

13.   Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person....

14.   In 1982, Sun Life of Canada acquired the MFS investment management operation for $40 million. By 2000, MFS was contributing $ (Canadian) 65 million in net income to Sun Life's bottom line in a single *quarter*. For 2002, MFS's earnings were $174 million; for 2003, operating earnings were $168 million. MFS's revenues for 2002 were $1.26 billion. Growth of assets under management has generated substantial economies of scale, to the great benefit of the Defendants and their parent company, Sun Life Financial Services of Canada, Inc.

15.   While the Funds have grown dramatically in size, the nature of the services rendered by Defendants has changed little, if at all. Indeed, advances in computing and communication technologies in the past twenty years have resulted in exponential efficiencies that have dramatically reduced the costs of servicing mutual funds in ways Congress could not have imagined when it enacted ICA § 36(b). Nonetheless, the distribution and advisory fees paid to Defendant Advisors have grown dramatically, as have MFS profits. As a result, the advisory

4

fees paid to Defendants (and accepted by them in violation of their statutory fiduciary duties) are disproportionately large in relationship to the services rendered to Plaintiffs.

16.     In addition, Defendants, in violation of their fiduciary duties to Plaintiffs, have retained excess profits resulting from economies of scale. These economies of scale are a product of the dramatic growth in assets managed by Defendants, caused in part by marketing programs paid for with the distribution fees charged to Plaintiffs and in part by Defendants' ability to provide the identical investment advisory services they provide Plaintiffs to other clients at little or no additional cost. The excess profits resulting from these economies of scale belong to Plaintiffs and the other shareholders of the Funds.

17.     The fees paid to Defendants are technically approved by the Fund's boards of directors[1]. A majority of the boards are comprised of statutorily presumed "disinterested" directors as that term is defined in § 10 of the ICA. Regardless of whether these presumably "disinterested" directors meet the requirements of § 10 of the ICA, there is an obvious lack of conscientiousness and aggressiveness by the directors in reviewing, negotiating and approving the advisory and distribution fees paid by each of the Funds. In addition, even if statutorily disinterested, the directors are in all practical respects dominated and unduly influenced by Defendants in reviewing and approving the fees paid by Plaintiffs and other shareholders of the Funds. In particular, Defendants do not provide the directors with sufficient information for the directors to fulfill their obligations, a factor supporting a finding that Defendants have breached their fiduciary duties.

---

[1] While some of the Funds at issue here are technically governed by a board of trustees rather than directors, the term "directors" is used throughout the complaint and should be read as synonymous with "trustees," as it is under the ICA. *See* 15 U.S.C., § 80a-2(a)(12).

18.    Although the fees challenged in this lawsuit may appear to be very small on a

shareholder-by-shareholder basis, they cause a dramatic decrease in Plaintiffs' investment

returns over time.  Arthur Levitt, past Chairman of the Securities and Exchange Commission

("SEC"), was critical of what he called the "tyranny of compounding high costs":

>  Instinct tells me that many investors would be shocked to know how
>  seemingly small fees can over time, create such drastic erosion in
>  returns....In the years ahead, what will mutual fund investors say if they
>  realize too late their returns have fallen hard under the weight of
>  compounding fees?

19.    Arthur Levitt, Jr., Inaugural address:  Costs Paid with Other People's Money,

Address at Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L.

261, 267 (2001).

### Rule 12b-1 Distribution Plans

20.    Prior to 1980, the use of fund assets (which are owned by the shareholders) to sell

new fund shares was prohibited.  The SEC had historically been reluctant to allow fund advisers

to charge their shareholders for selling shares to others:

>  [T]he cost of selling and purchasing mutual fund shares should be borne
>  by the investors who purchase them and thus presumably receive the
>  benefits of the investment, and not, even in part, by the existing
>  shareholders of the fund who often derive little or no benefit from the sale
>  of new shares.

21.    Statement on the Future Structure of the Securities Markets, [Feb. 1972] Sec. Reg.

& L. Rep. (BNA) No. 137 pt. II, at 7.

22.    After intense lobbying by the mutual fund industry, the Commission agreed to

consider modifying its objections to allow current fund shareholders to pay distribution

expenses.  In early comment letters and in proxy statements proposing adoption of plans of

distribution, the mutual fund industry argued that adding assets to an existing mutual fund would

create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund shareholders at dramatically lower costs.

23.     Accepting the mutual fund industry's argument that a growth in assets would lead to a quid pro quo reduction in advisory fees and other expenses, the Commission tentatively approved Rule 12b-1, 17 C.F.R. § 270.12b-1.  However, numerous conditions were attached to the use of fund assets to pay distribution expenses.  For example, the Commission wanted to be certain that investment advisers would not "extract additional compensation for advisory services by excessive distributions under a 12b-1 plan." *Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861, 866 (2d Cir. 1990).  Unfortunately, that is precisely what Defendants have done: extracted additional compensation for their retail advisory services by causing Plaintiffs and other shareholders to pay Defendants' marketing expenses to acquire new shareholders so that these new shareholders could pay additional advisory fees to Defendants.  Under this regime, Defendants get the financial benefit; Plaintiffs bear the financial burden.

24.     Defendants have adopted 12b-1 Distribution Plans for the Funds.  These Distribution Plans must be reviewed annually by the Funds' directors.  In particular, the directors must "request and evaluate . . . such information as may reasonably be necessary to an informed decision of whether such plan should be implemented or continued." 17 C.F.R. § 270.12b-1(d). In addition, minutes must be maintained to record all aspects of the directors' deliberation, and the directors must conclude "in light of their fiduciary duties under state law and under Sections 36(a) and (b) of the ICA, that there is a reasonable likelihood that the Distribution Plans will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e).

25.     Despite the dramatic growth in assets managed by Defendants, both the advisory and distribution fees charged by Defendants have grown, both in terms of whole dollars and as a

percentage of assets. Accordingly, the Distribution Plans have produced no economies-of-scale benefits to the shareholders of the Funds. Rather, the Distribution Plans have served only Defendants, just as the Commission feared when it found that "the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore such use of fund assets should not be permitted." Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 9915, 1977 SEC LEXIS 943 (Aug. 31, 1977). As such, the Distribution Plans violate the intent and purpose of Rule 12b-1 and are entirely a waste of fund assets.

26.    Furthermore, the distribution fees are based on the net asset value of the Funds and not on the distribution activity, if any, by Defendants, such as number of shares sold. Accordingly, in addition to failing to benefit Plaintiffs and other shareholders, the Distribution Plans have extracted additional compensation for advisory services to Defendants, thereby resulting in excessive fees paid to them. For example, any portion of the fees paid to Defendants that are derived from market increases in the net asset value of the fund rather than any distribution activity by Defendants constitutes additional and excessive compensation for advisory services.

27.    Despite the fact that Plaintiffs and the other shareholders of the Funds have enjoyed no benefits from the Distribution Plans, even though they contributed to the growth of fund assets by paying distribution fees, and despite the fact that the Distribution Plans have allowed Defendants to extract additional and excessive compensation from Plaintiffs and the other shareholders of the Funds, the directors of the Funds have continued to approve, year after year, continuation of the Distribution Plans in violation of both Rule 12b-1 and § 36(b).

### Nature of Claims

28.    In this action, Plaintiffs seek to rescind the investment advisory agreements and Distribution Plans and to recover the total fees charged by Defendants or, alternatively, to recover the excess profits resulting from economies of scale wrongfully retained by Defendants and to recover other excessive compensation received by, or improper payments wrongfully retained by, Defendants in breach of their fiduciary duty under the ICA § 36(b), 15 U.S.C. § 80a-35(b). Because the conduct complained of herein is continuing in nature, Plaintiffs seek recovery for a period commencing at the earliest date in light of any applicable statute of limitations through the date of final judgment after trial.

29.    No pre-suit demand on the boards of directors of the Funds is required, as the requirements of Rule 23.1 do not apply to actions under § 36(b) of the ICA. *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984).

### III. PARTIES

30.    Plaintiff Marcus Dumond is a resident of Brandon, Florida, and a shareholder at all relevant times of the MFS Emerging Growth Fund. The MFS Emerging Growth Fund is a registered investment company under the Investment Company Act of 1940, and a series of the MFS Series Trust II, a registered Massachusetts business trust.

31.    Plaintiff Henry Berdat is a resident of Largo, Florida, and a shareholder at all relevant times of the MFS Capital Opportunities Fund, the MFS Strategic Growth Fund, and the Massachusetts Investors Growth Stock Fund. The MFS Capital Opportunities Fund, the MFS Strategic Growth Fund, and the Massachusetts Investors Growth Stock Fund are all registered investment companies under the Investment Company Act of 1940. The MFS Capital Opportunities Fund is a series of the MFS Series Trust VII, a registered Massachusetts business

9

trust. The MFS Strategic Growth Fund is a series of the MFS Series Trust I, a registered Massachusetts business trust. The Massachusetts Investors Growth Stock Fund is a registered Massachusetts business trust.

32.    Plaintiffs Stuart V. Sturgess and Rosemary Sturgess are residents of Palm Harbor, Florida, and shareholders at all relevant times of the MFS Capital Opportunities Fund. The MFS Capital Opportunities Fund is a registered investment company under the Investment Company Act of 1940, and a series of the MFS Series Trust VII, a registered Massachusetts business trust.

33.    Plaintiff Kathleen Blair is a resident of Pensacola, Florida, and a shareholder at all relevant times of the MFS Governmental Securities Fund, the MFS Mid Cap Growth Fund, and the MFS Total Return Fund. The MFS Governmental Securities Fund, the MFS Mid Cap Growth Fund, and the MFS Total Return Fund are all registered investment companies under the Investment Company Act of 1940. The MFS Governmental Securities Fund is a Massachusetts business trust. The MFS Mid Cap Growth Fund is a series of the MFS Series Trust IV, a registered Massachusetts business trust. The MFS Total Return Fund is a series of the MFS Series Trust V, a registered Massachusetts business trust.

34.    Plaintiffs William Booth and Margie Booth are residents of New Port Richey, Florida, and shareholders at all relevant times of the MFS Mid Cap Growth Fund and the MFS Value Fund. The MFS Mid Cap Growth Fund and the MFS Value Fund are both registered investment companies under the Investment Company Act of 1940. The MFS Mid Cap Growth Fund is a series of the MFS Series Trust IV, a registered Massachusetts business trust. The MFS Value Fund is a series of the MFS Series Trust I, a registered Massachusetts business trust.

35.    Plaintiff Karen Peach is a resident of St. Petersburg, Florida, and a shareholder at all relevant times of the MFS Research Fund. The MFS Research Fund is a registered

10

investment company under the Investment Company Act of 1940, and a series of the MFS Series Trust V, a Massachusetts business trust.

36.    Plaintiffs Richard Keller and Evelyn Keller are residents of Scottsdale, Arizona, and shareholders at all relevant times of the MFS Municipal Income Fund and the MFS Government Limited Maturity Fund.  The MFS Municipal Income Fund, and the MFS Government Limited Maturity Fund are both registered investment companies under the Investment Company Act of 1940 and are both registered Massachusetts business trusts.

37.    MFS Fund Distributors, Inc. is a Delaware corporation with its principal place of business in Boston, Massachusetts, and it serves as the principal underwriter and distributor of the shares in the Plaintiff mutual funds.

38.    Massachusetts Financial Services Company is a Delaware corporation headquartered in Boston, Massachusetts.

## IV.  GENERAL ALLEGATIONS

39.    The test for determining whether compensation paid to Defendants violates § 36(b) is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982).  In order to violate § 36(b), "the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.*

40.    In applying this test, all pertinent facts must be weighed in determining whether a fee or other compensation violates § 36(b).  The *Gartenberg* court specifically identified six factors (a portion of "all pertinent facts") to be considered in determining whether a fee is so

11

disproportionately large that it bears no reasonable relationship to the services rendered. These factors include: (1) the nature and quality of the services rendered; (2) the profitability of the funds to the advisor/manager; (3) economies of scale; (4) comparative fee structures; (5) fallout benefits (i.e. indirect profits to the advisor/manager resulting from the existence of the funds); and (6) the care and conscientiousness of the directors. A review of these factors, and the facts in this case, demonstrates that the fees charged by Defendants to the Funds violate § 36(b).

### (A)  The Nature and Quality of the Services Provided to the Funds

41.    The nature of the investment advisory services provided to the Funds is straightforward: Defendants buy and sell, at their discretion, stocks, bonds, and other securities for the Funds. This is precisely the same service provided to Defendants' institutional and other clients (albeit at a dramatically dollar lower cost). On information and belief, the materials provided by Defendants to the directors of the Funds establish that the nature of these services has remained unchanged despite dramatic growth in the assets of the Funds and advisory revenues.

42.    Despite the fact that the Funds receive identical investment advisory services as Defendants' institutional and other clients, Plaintiffs pay Defendants dramatically higher fees because these fees are not negotiated at arm's length as they are with the institutional and other clients. This disparity in fees evinces Defendants' willingness and determination to prefer their own financial interests to the interests of the Funds and the shareholders of the Funds.

43.    On information and belief, Defendants repeatedly put their own financial interests ahead of the interests of the Funds and the shareholders of the Funds by participating in arrangements and schemes that benefit Defendants at the expense of the Funds and the shareholders of the Funds. The cost of this conflict of interest, which does not exist in the case

12

of the arm's-length relationships with institutional clients, is manifest not only in higher fees, but also in other losses and expenses borne by the Funds and the shareholders of the Funds. These losses and expenses directly impact the quality of the investment advisory services Defendants provide to the Funds.

44.    One example of Defendants' willingness and determination to prefer their own financial interests to the interests of the Funds and shareholders of the Funds is Defendants' involvement in illegal uses of fund assets to attract additional business. One example of such illegal use of fund assets is where Defendants use 12b-1 fees provided by the retail fund shareholders to attract non-retail clients that benefit from certain considerations (such as fee rebates) at the expense of the retail fund shareholders but with no economic benefit accruing to retail fund shareholders.

45.    Another example is where Defendants use fund assets, in violation of Rule 12b-1, to participate in pay-to-play schemes such as "directed brokerage," where the Defendants cause the Funds to make payments over and above the payments permitted under the Funds' 12b-1 plan limits. Defendants direct the Funds' brokerage business to brokerage firms and pay them above-market rates to promote Defendants' mutual funds over other funds sold by the brokerage firms. On information and belief, payments are also improperly channeled to employee benefit fund fiduciaries and/or advisors to compensate them for selecting MFS funds on their retirement plan menus. These payments are illegal and improper under federal law and the common law.

### (B) The Profitability of the Fund to the Adviser/Manager

46.    "[T]he 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its adviser be equivalent to 'the product of arm's-length bargaining.'" *See* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of*

*Interest*, 26 J. Corp L. 610, 661 (2001) (the "Freeman & Brown Study") (citing *Gartenberg*) [Ex.

1]. The profitability of a fund to an adviser-manager is a function of revenues minus the costs of

providing services. However, upon information and belief, Defendants' reporting of their

revenues and costs is intended to, and does, obfuscate Defendants' true profitability. For

instance, upon information and belief, Defendants employ inaccurate accounting practices in

their financial reporting, including arbitrary and unreasonable cost allocations.

47.    Defendants' true profitability can be determined on either an incremental basis or

a full-cost basis. Defendants' incremental costs of providing advisory services to Plaintiffs are

nominal, while the additional fees received by Defendants are hugely disproportionate given that

the nature, quality, and level of the services remain the same. On information and belief, a

review of Defendants' full costs of providing advisory services will also demonstrate the

enormous profitability to Defendants of managing the Funds.

48.    As noted above, the assets managed by Defendant Advisor within the Fund

Complex have grown dramatically. So have revenues, net income and profit margins. Over that

period, the immense growth of assets under management has generated substantial economies of

scale to the great benefit of the Defendants and their parent company, Sun Life.

### (C) Economies of Scale

49.    The existence of economies of scale in the mutual fund industry has been recently

confirmed by both the SEC and the Governmental Accounting Office (the "GAO"). Both

conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of

scale exist in the provision of advisory services. *See* SEC Division of Investment Management:

Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31 [Ex. 2]; GAO,

Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous

Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9 [Ex. 3].

50.      In addition, the most significant academic research undertaken since the Wharton School study in the 1960s establishes the existence of economies of scale that are not being passed along to mutual fund shareholders in violation of Defendants' duty to do so under § 36(b) and Rule 12b-1. *See* Freeman & Brown Study" [Ex. 1]. As the Freeman & Brown Study noted: "The existence of economies of scale has been admitted in SEC filings made by fund managers and is implicit in the industry's frequent use of fee rates that decrease as assets under management increase. Fund industry investment managers are prone to cite economies of scale as justification for business combinations." *Id.* at 620 [Ex. 1].

51.      These economies of scale exist not only fund by fund, but also exist with respect to an entire fund complex, and even with respect to an investment advisor's entire scope of operations, including services provided to institutional and other clients. *See* Freeman & Brown Study at 621 n.62 (quoting Victoria E. Schonfeld & Thomas M.J. Kerwin, Organization of a Mutual Fund, 49 Bus. Law 107 (1993)) [Ex. 1].

52.      The clearest example of economies of scale occurs when total assets under management increase due purely to market forces (without the institution of new advisory relationships or new asset gathering). In such instances, as the GAO confirms, it is possible for the advisor to service the additional assets with zero additional costs. *See* GAO Report at 9 (noting that growth from portfolio appreciation is unaccompanied by costs) [Ex. 3]. In other words, an investment advisor can advise a fund that doubles in size purely because of market forces with no increased costs because the services are unchanged. *See* GAO Report at 9 [Ex. 3]; Freeman & Brown Study at 619 n.43, 621 (noting that investment advisors have benefited by

garnering "increased fees from the general increase in market prices with no commensurate efforts on their part" and also noting that as much as 64% of mutual fund asset growth has come from appreciation of portfolio securities, which, unlike growth from share sales to new investors, is costless) [Ex. 1].

53.    For example, an article published in the *San Francisco Chronicle* April 20, 1992, at p. D6, contained this report on the lucrative economies of scale reaped by Franklin Resources, which runs a major mutual fund complex similar to MFS:

> Through recession and recovery, stock-market boom and stock-market bust, Franklin Resources keeps squeezing high profits out of each dollar it receives in revenues.
>
> The San Mateo mutual-fund company had the highest return on sales of any publicly held Northern California company again last year. That's the sixth consecutive year Franklin has topped that category.
>
> Franklin posted a 31.15 percent return on sales, the same percentage as in 1990. That means that 31.15 cents out of every $ 1 Franklin received in revenues -- management fees for operating its various mutual funds -- fell to the bottom line as profit.
>
> "We benefit from economies of scale," said Greg Johnson, vice president of marketing at Franklin. "As our asset base grows, the cost of servicing our shareholders does not grow proportionately."

54.    In the time period 1960-69, MFS's predecessor, Massachusetts Investors Trust, was managed in a way that was beneficial to its shareholders. It featured an expense ratio of .19 percent. In 1969, the trustees sought and got shareholder permission to move from internal management to external management of the fund, "demutualizing" it, and thereby adopting the conventional mutual fund management structure. The .19 percent expense ratio in 1969 doubled to .39 percent in 1976, and doubled again to .75 percent in 1994, and continued to rise in 1998 to .97 percent and to 1.2 percent in 2003. In 1949, the MIT fund's expenses were 3.5 percent of fund income; in 2002, MIT's expenses consumed 80.4 percent of fund income. In 1969, the MIT

Fund's assets were $2.2 billion, and its management fees, which included some relatively small operating costs, totaled $4.4 million. In 1979, the fund's assets had declined to $1.1 billion and fees had risen to $6.3 billion. In 1999, assets soared to $15.6 billion, a seven-fold increase from the 1969 figure, with fees jumping 36 times, to $158 million. In 2003, assets were $6.5 billion (a 3 times increase from 1969), with advisory fees at $78.4 million, a 17 times increase.

55. The economies of scale enjoyed by Defendants with respect to the Funds have not been shared with Plaintiffs as required by § 36(b) and Rule 12b-1. As a result, the fees paid to Defendants for advisory services provided to the Funds are grossly disproportionate to those services, are excessive, and violate § 36(b).

### (D) Comparative Fee Structures

56. The fees advisors receive from mutual funds for investment advisory services are directly comparable to, though much higher than, the fees advisors receive from other clients for the identical services. As the Freeman & Brown Study noted: "None of the leading advisory fee cases involved equity funds, and hence, none of the courts were confronted directly with the strong analogies that can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower." Freeman & Brown Study at 653 [Ex. 1]. While a "manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds. The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower." Freeman & Brown Study at 627-28 [Ex. 1]. Indeed, "a mutual fund, as an entity, actually is an institutional investor. When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on

17

'institutional status,' it turns on self-dealing and conflict of interest." Freeman & Brown Study

at 629 n.93 [Ex. 1]. Accordingly, the "'apples-to-apples' fee comparisons between equity

pension managers and equity fund managers can be most difficult and embarrassing for those

selling advice to mutual funds." Freeman & Brown Study at 671-72 [Ex. 1].

  57. More recently, New York's Attorney General, Eliot Spitzer, surveyed two fund

complexes and confirmed the existence of massive over-charging of fund advisory fees.

Specifically, Mr. Spitzer testified before a Senate Subcommittee on January 27, 2004, as follows:

> Putnam's mutual fund investors were charged 40 percent more for
> advisory services than Putnam's institutional investors. In dollar terms,
> what this fee disparity means is that in 2002 Putnam mutual fund investors
> paid $290 million more in advisory fees than they would have paid had
> they been charged the rate given to Putnam's institutional clients, and
> these are for identical services.
>
> There was a similar disparity in the advisory fees charged by Alliance.
> Once again, mutual fund investors were charged significantly higher
> advisory fees than institutional investors. Specifically, Alliance's mutual
> fund investors paid advisory fees that were twice those paid by
> institutional investors. In dollar terms, this means that Alliance investors
> paid more than $200 million more in advisory fees than they would have
> paid had they been charged the rate given to Alliance's institutional
> clients.

  58. On information and belief, the shareholders of the Funds at issue here are plagued

by the same discriminatory over-charging. For example, MFS provides investment advisory

portfolio management and administrative services to each of the funds. In the case of MIT, MFS

charges a fee based on fund net assets equal to .33 percent annually, for the other Funds, the fee

is substantially higher. For Mid-Cap, the fee is .75 percent, for New Discovery, the fee is .90

percent, for Global Trust, the fee is .84 percent. MFS agreed in 2003 to manage an equity

portfolio for the Public Employee Retirement System of Idaho. Under the terms of its contract

with PERSI, MFS collected fees of $595,000 for managing an equity portfolio of $173 million,

yielding a management fee rate of 34 percent. Thus, when offering its equity advisory services in the free market, MFS is content to charge less than $600,000 for its work. Yet, when offering its services to its own mutual funds, MFS charges in the case of MIT, 35 times as much money ($21.6 million in 2003), in the case of Mid-Cap 20 times as much, in the case of New Discovery 17 times as much, and in the case of the relatively small ($500 million) Global Total Return, 5 times as much. By way of illustration, were advisory fees for Mid-Cap and New Discovery set according to the same schedule, the two funds' advisory fees would be shrunk by more than $10 million annually, costing fund shareholders less than half as much.

59.    Looked at in isolation in comparison with the fees charged PERSI for its money management, the advisory fee for MIT of 33 basis points may not appear excessive. It is excessive, however, in light of the demonstrable history of management's refusal since 1969 fairly to share economies of scale with MIT fund shareholders. Charging of management fees and other expenses by MFS for MIT shareholders is chronicled in great detail in fund industry pioneer John C. Bogle's written testimony presented to a Senate subcommittee on January 27, 2004. See Exh. 4, p. 3 - 6.

### (E)  Fallout Benefits

60.    Defendants indirectly profit because of the existence of the Funds through fallout benefits. Obvious, but difficult to quantify fallout benefits include the attraction of new customers, cross selling related funds to current customers, and other benefits associated generally with the development of goodwill and the growth in assets of the Funds.

61.    Other, easier to quantify, benefits include "soft dollars" payable from broker-dealers. "Soft dollars" are essentially credits furnished to Defendants from broker-dealers and other securities-industry firms in exchange for routing the Funds' securities transaction orders

and other business to paying firms. These soft-dollar credits should be used to purchase research and other goods or services that benefit the shareholders of the Funds. On information and belief, however, the soft-dollar arrangements benefit Defendants and result in increased costs to the shareholders of the Funds with little to no corresponding benefits to the shareholders of the Funds. On information and belief, the soft dollar arrangements are concealed from the shareholders of the Funds in breach of Defendants' fiduciary duty.

62.     On information and belief, Defendants also receive "kickbacks," either directly or indirectly, as transfer agency and custodian fees grow due to increases in the assets of the Funds and the number of shareholders.

63.     On information and belief, Defendants receive further fallout benefits from securities lending arrangements. Essentially, Defendants loan out the securities of the Funds and receive compensation as the lending agents of the Funds.

64.     A highly profitable fallout benefit to Defendants is the ability to sell investment advisory services paid for by the Funds at virtually no additional cost. Much like computer software, once the investment research and resulting recommendations are paid for, that research and those recommendations may be sold to other clients at virtually no cost whatsoever to Defendants. Without payment by Plaintiffs and other shareholders of the Funds of millions of dollars in advisory and distribution fees (especially distribution fees that are nothing more than a means to extract additional compensation for advisory services), Defendants would have to pay to conduct that research independently in order to provide investment advisory services to other clients, including institutional clients. This is a natural byproduct of the extraordinary economies of scale inherent in the investment advisory business. However, although Plaintiffs and other shareholders of the Funds pay all of the costs associated with the investment advisory services,

20

Defendants resell these services to third parties without compensating Plaintiffs through reduced fees or in any other way.

65.    On information and belief, Defendants do not provide sufficient information regarding the existence and extent of these and other fallout benefits to the shareholders of the Funds or to the Funds' directors. The directors are thus unable to quantify or even meaningfully consider the benefits. Plaintiffs and other shareholders of the Funds have paid for these benefits and are entitled to compensation in the form of reduced advisory fees and the elimination of distribution fees.

### (F) The Independence and Conscientiousness of the Fund Directors

66.    At least 40% of the Funds' directors must be "disinterested" as defined in § 10 of the ICA. As the GAO Report noted, the structure of most mutual funds embodies a potential conflict of interest between the fund's shareholders and its adviser. This conflict arises because the fees paid by the shareholders represent revenue to the adviser. The United States Supreme Court has stated that the disinterested-director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest. *Burks v. Lasker*, 441 U.S. 471 (1979).

67.    The disinterested directors are supposed to serve as "watchdogs" for the shareholders of the Funds. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all contracts and agreements with Defendants and reviewing the reasonableness of the advisory and distribution fees received by Defendants. Accordingly, as noted by the GAO, the directors are expected to review, among other things, the advisor's costs, whether fees have been reduced when the Funds' assets have grown, and the fees charged for similar services. *See* GAO Report at 14 [Ex. 3]. These responsibilities are intensive, requiring the directors to rely on information provided by

21

Defendants. Defendants, in turn, have a fiduciary duty to provide all information reasonably

necessary for the directors to perform their obligations. *See* 15 U.S.C., § 80a-15(c); 17 C.F.R. §

270.12b-1.

68.     The ICA contains a presumption that the disinterested directors are in fact

disinterested. However, the lack of conscientiousness of even disinterested directors in

reviewing the fees paid by the Funds, the lack of adequate information provided to the directors

in connection with their approvals of the advisory agreements and Distribution Plans, and the

control of management over the directors in reviewing the fees paid by the Funds are not

presumed but, rather, are important factors recognized in the *Gartenberg* line of cases in

determining whether Defendants have breached their fiduciary duties. In addition, the SEC has

specifically recognized that even disinterested directors may not be independent but, rather, may

be subject to domination or undue influence by a fund's investment adviser. For example, the

SEC has stated that "disinterested directors should not be entrusted with a decision on use of

fund assets for distribution without receiving the benefit of measures designed to enhance their

ability to act independently." Bearing of Distribution Expenses by Mutual Funds, Investment

Co. Act Rel. No. 11414, 1980 SEC LEXIS 444 at *36 (Oct. 28, 1980).

69.     Two noteworthy industry insiders have commented on the general failure of

mutual fund boards to fulfill their responsibilities under the ICA. Jack Bogle, founder of the

Vanguard Group, made the following comment:

> Well, fund directors are, or at least to a very major extent, sort of a
> bad joke. They've watched industry fees go up year after year,
> they've added 12b-1 fees. I think they've forgotten, maybe they've
> never been told, that the law, the Investment Company Act, says
> they're required to put the interest of the fund shareholders ahead of
> the interest of the fund adviser. It's simply impossible for me to see
> how they could have ever measured up to that mandate, or are
> measuring up to it.

Warren Buffet, famous investor and chairman of Berkshire Hathaway, Inc. made the following

comment, which was recently quoted by a United States District Court:

> I think independent directors have been anything but independent.
> The Investment Company Act, in 1940, made these provisions for
> independent directors on the theory that they would be the watchdogs
> for all these people pooling their money. The behavior of
> independent directors in aggregate since 1940 has been to rubber
> stamp every deal that's come along from management—whether
> management was good, bad, or indifferent. Not negotiate for fee
> reductions and so on. A long time ago, an attorney said that in
> selecting directors, the management companies were looking for
> Cocker Spaniels and not Dobermans. I'd say they found a lot of
> Cocker Spaniels out there. *Strougo v. BEA Assoc.*, 188 F. Supp.2d
> 373, 383 (S.D.N.Y. 2002) (citation omitted).

Mr. Buffet has also stated, in his letter to shareholders in the 2002 Berkshire

Hathaway, Inc. annual report:

> [A] monkey will type out a Shakespeare play before an "independent"
> mutual-fund director will suggest that his fund look at other managers,
> even if the incumbent manager has persistently delivered substandard
> performance. When they are handling their own money, of course,
> directors will look to alternative advisors – but it never enters their
> minds to do so when they are acting as fiduciaries for others. . . .
> Investment company directors have failed as well in negotiating
> management fees . . . . If you or I were empowered, I can assure you
> that we could easily negotiate materially lower management fees with
> the incumbent managers of most mutual funds. And, believe me, if
> directors were promised a portion of any fee savings they realized, the
> skies would be filled with falling fees. Under the current system,
> though, reductions mean nothing to "independent" directors while
> meaning everything to managers. So guess who wins? . . . [I]n
> stepping up to [their] all-important responsibilities, tens of thousands
> of "independent" directors, over more than six decades, have failed
> miserably. (They've succeeded, however, in taking care of
> themselves; their fees from serving on multiple boards of a single
> "family" of funds often run well into six figures.) 2002 Berkshire
> Hathaway, Inc. Annual Report to Shareholders, p. 17 – 18.

70.    As part of their scheme to receive excessive fees, Defendants did not keep the

directors fully informed regarding all material facts and aspects of their fees and other

compensation, and the directors failed to insist upon adequate information. On information and belief, Defendants provided virtually no information to the directors regarding the advisory fees charged to pension and other institutional clients or to other mutual funds being advised or sub-advised by Defendants. On information and belief, Defendants provided virtually no information to the directors regarding the economies of scale enjoyed or fallout benefits received by Defendants. On information and belief, the profitability data given to the board of directors provide no explanation as to how the board should evaluate economies of scale and do not explain how the shareholders benefit from distribution plans. On information and belief, the board of directors of the Funds failed to request and evaluate, and Defendants failed to provide, information reasonably necessary to an informed determination of whether the Distribution Plans should have been implemented and whether they should be continued. On information and belief, the directors rarely, if ever, questioned any information or recommendations provided by Defendants.

71.     The foregoing assures that the directors do not understand Defendants' true cost structure and, in particular, the economies of scale enjoyed by them in providing investment advisory services to the Funds and their institutional and other clients. Nor do the directors understand the nature of the Distribution Plans and the benefits received by Defendants, and lack of benefits received by Plaintiffs, from the Distribution Plans.

72.     On information and belief, the Funds' disinterested directors have not received the benefit of any measures to enhance their ability to act independently, which has caused the directors to be dependent on Defendants and has allowed Defendants to dominate and unduly influence the directors. In addition, the directors' failure to insist on adequate information evinces a lack of care and conscientiousness on their part.

## COUNT I
## ICA §36(b)
## BREACH OF FIDUCIARY DUTY
### (Excessive Investment Advisory Fees)

73.     Plaintiffs repeat and re-allege paragraphs 1 through 72, inclusive, of this complaint.

74.     The fees charged by Defendants or their affiliates for providing advisory services to the Funds are and continue to be disproportionate to the services rendered and are not within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances, including the advisory fees that Defendants charge their other clients.

75.     In charging and receiving excessive or inappropriate compensation, and in failing to put the interests of Plaintiffs and the other shareholders of the Funds ahead of their own interests, Defendants have breached and continue to breach their statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

76.     Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, "the amount of compensation or payments received from" the Funds.

## COUNT II
## ICA § 36(b)
## BREACH OF FIDUCIARY DUTY
### (Excess Profits from Economies of Scale)

77.     Plaintiffs repeat and re-allege paragraphs 1 through 72, inclusive, of this complaint.

78.     Defendants have received and continue to receive excess profits attributable to extraordinary economies of scale and, ironically, at least in part at Plaintiffs' expense, in the form of payment of distribution fees benefiting only Defendants.

79.    By retaining excess profits derived from economies of scale, Defendants have breached and continue to breach their statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

80.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, the "amount of compensation or payments received from" the Funds.

## COUNT III
## ICA § 36(b)
## BREACH OF FIDUCIARY DUTY
### (Excessive Rule 12b-1 Distribution fees and Extraction of Additional Compensation for Advisory Services)

81.    Plaintiffs repeat and re-allege paragraphs 1 through 72, inclusive, of this complaint.

82.    The distribution fees charged and received by Defendants or their affiliates were designed to, and did, extract additional compensation for Defendants' advisory services in violation of Defendants' fiduciary duty under § 36(b).  Although the distribution fees may have contributed to the growth in assets of the Funds, the resulting economies of scale benefited only Defendants, and not Plaintiffs or the Funds.

83.    In failing to pass along economies-of-scale benefits from the distribution fees, and in continuing to assess distribution fees pursuant to plans of distribution despite the fact that no benefits inured to Plaintiffs, Defendants have violated, and continue to violate, the ICA and have breached and continue to breach their statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

84.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, the "amount of compensation or payments received from" the Funds.

COUNT IV
ICA § 12(b)
(Unlawful Distribution Plans)

85.      Plaintiffs repeat and re-allege paragraphs 1 through 72, inclusive, of this complaint.

86.      Plaintiffs and other shareholders in the Funds each paid service or distribution fees to Defendants

87.      When Defendants first initiated the Distribution Plans, they represented that the distribution fees were being collected in order to, at least in part, grow the assets of the Funds in order to reduce the cost to Plaintiffs of providing advisory services.  Only one of the following alternatives could possibly have occurred:

        a.      The Funds grew as a result of the payment of distribution fees and market forces, in which case economies of scale were generated but not passed on to Plaintiffs or the Funds; or

        b.      The distribution fees did not contribute to economies of scale, produced no other material benefits for Plaintiffs and the other shareholders of the Funds, and should not have been approved or continued.

88.      Either way, Defendants have violated § 12(b) of the ICA and Rule 12b-1, 17 C.F.R. § 270.12b-1, by accepting excessive or inappropriate compensation in violation of the fiduciary duty owed by them to the Fund.  Defendants' violation of § 12(b) and Rule 12b-1 is continuing in nature.

89.      Moreover, Defendants have spent fund assets on distribution over and above the limits imposed on 12b-1 payments, hiding such payments in brokerage expense costs (directed brokerage).

90.    Additionally, Defendants have treated individual fund shareholders such as Plaintiffs improperly by diverting their 12b-1 payments to illicit rebates or illicit payoffs to fiduciaries in order to bring assets into the Fund Complex for the Defendant Advisors to manage, to MFS and Sun Life's benefit with no corresponding benefits flowing to Plaintiffs or the other fund shareholders by virtue of this diversion of their assets.

91.    The wrongful rebates and other payments represent undisclosed discriminatory diversions of fund assets in breach of Defendants' fiduciary duties.  To the extent that the payments constitute reductions in prices to affected fund purchasers, they constitute illegal sales in violation of section 22 of the Investment Company Act since they represent sales at prices or under terms not disclosed in the prospectus.

92.    Defendants have violated § 12(b) of the ICA and Rule 12b-1, 17 C.F.R. § 270.12b-1, by accepting excessive or inappropriate compensation, or by making improper uses of fund assets, in violation of the fiduciary duty owed by them to the Funds.  Defendants violation of § 12(b) and Rule 12b-1 is continuing in nature.

93.    Plaintiffs seek damages resulting from the adoption and continuation of these unlawful Distribution Plans and unlawful Distribution Practices.

WHEREFORE, Plaintiffs demand judgment as follows:

A.    An order declaring that Defendants have violated and continue to violate § 12, § 36(b), § 22 and Rule 12b-1 of the ICA and that any advisory or distribution agreements entered into are void ab initio;

B.    An order preliminarily and permanently enjoining Defendants from further violations of the ICA;

28

C.    An order awarding damages against Defendants including all fees paid to them by Plaintiffs and the Funds for all periods not precluded by any applicable statutes of limitation through the trial of this case, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law;

D.    Such other and further relief as may be proper and just.

Dated: May 4, 2004

JOHNSON, POPE, BOKOR,
RUPPEL & BURNS, L.L.P.

By: _Becky Ferrell-Anton_

Guy M. Burns, FBN 160901
Jonathan S. Coleman, FBN 797480
Becky Ferrell-Anton, FBN 449342
100 North Tampa Street, Ste. 1800
Tampa, FL  33602
(813) 225-2500
Fax:  (813) 223-7118

Michael J. Brickman
James C. Bradley
Nina H. Fields
RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN LLC
174 East Bay Street
Charleston, SC  29401
(843) 727-6500
Fax: (843) 727-3103

Lynn Lincoln Sarko
Michael D. Woerner
Gretchen F. Cappio
KELLER ROHRBACK, LLP
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052.
(206) 623-1900
Fax: (206) 623-3384

*Attorneys for Plaintiff*

86923